**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: _9/13/2019_

**Martha Narvaez,**

                    **Plaintiff,**

          **-against-**

**Commissioner of Social Security**
**Administration,**

                  **Defendant.**

**1:18-cv-01130 (SDA)**

**OPINION AND ORDER**

**STEWART D. AARON, UNITED STATES MAGISTRATE JUDGE:**

Plaintiff Martha Narvaez ("Narvaez" or "Plaintiff") brings this action pursuant to § 205(g) of the Social Security Act (the "Act"), 42 U.S.C. § 405(g), challenging the final decision of the Commissioner of Social Security, denying her applications for disability insurance benefits ("DIB") and supplemental security income ("SSI"). (Compl., ECF No. 1.) Presently before the Court is Plaintiff's motion, pursuant to Fed. R. Civ. P. 12(c), for judgment on the pleadings (Pl. Not. of Mot., ECF No. 14 & Pl. Mem., ECF No. 15), the Commissioner's cross-motion (Def. Not. of Mot., ECF No. 20 & Def. Mem., ECF No. 21) and Plaintiff's reply. (Pl. Reply, ECF No. 22.)

For the reasons set forth below, Plaintiff's motion is GRANTED, the Commissioner's cross-motion is DENIED, and this action is remanded for further proceedings.

## BACKGROUND

### I. Procedural Background

On June 11, 2013, Narvaez filed applications for DIB and SSI, alleging that she could not work, as of December 20, 2009, due to mood disorder, depression, anxiety and insomnia. (Administrative R. ("R."), ECF No. 13, at 318-28, 348.) On August 23, 2013, her applications were

yeah denied. (R. 99-117.) Thereafter, Narvaez requested a hearing, which was held on December 11, 2014 before Administrative Law Judge ("ALJ") Wallace Tannenbaum. (R. 40-56.) At the hearing, Narvaez was represented by counsel. (R. 40.) ALJ Tannenbaum denied her applications on February 18, 2015. (R. 118-37.) On July 15, 2016, the Appeals Council vacated and remanded the case due to errors by ALJ Tannenbaum. (R. 138-42.)

On October 18, 2016, a new hearing was held before ALJ Michael Friedman. (R. 57-98.) At the hearing, Narvaez was again represented by counsel. (*Id.*) On December 27, 2016, ALJ Friedman issued a decision denying Narvaez's applications for benefits. (R. 26-34.) ALJ Friedman's decision became the Commissioner's final decision when the Appeals Council denied Narvaez's request for review on December 21, 2017. (R. 1-8.) This action followed.

## II. Non-Medical Evidence

Born on November 13, 1971, Narvaez was 38 years old at the alleged onset date and 45 years old at the time of the 2016 ALJ hearing. (*See* R. 33, 318.) Narvaez attended school through the eighth grade in Puerto Rico and then attended ninth grade in the Bronx, New York. (R. 71.)[1] Narvaez's English language skills are limited, and she required a Spanish interpreter during the proceedings below. (R. 42, 59, 140-41.) From 1997 to December 20, 2009, Narvaez was self-employed as a babysitter. (R. 45-47, 52-53, 349.) In 2005, Narvaez also worked part-time as a cleaner in a private agency. (R. 349.)

---

[1] Narvaez reported to the Social Security Administration ("SSA") that she completed up to tenth grade in school (R. 349), but testified during the 2016 hearing that ninth grade was the farthest she got in school. (R. 71.)

III.     **Relevant Medical Evidence**

A.     **Metropolitan Center For Mental Health**

Narvaez began treatment at Metropolitan Center for Mental Health ("Metropolitan") on December 6, 2012. (R. 465-67.) Narvaez's Initial Treatment Plan included a diagnosis of dysthymic disorder[2] and indicated a generalized assessment of functioning ("GAF") score of 55.[3] (R. 467.) The treatment plan, which was signed by an intake clinician and psychiatrist, recommended weekly therapy as well as monthly medication review. (R. 466-67.) Psychiatrist Mariana Markella, M.D., saw Narvaez on December 8, 2012 and confirmed a diagnosis of dysthymia. (R. 464.) Dr. Markella continued Ambien,[4] and restarted Risperidone[5] and Wellbutrin[6], which Narvaez had last taken in September 2012.[7] (R. 464.) At an appointment on December 22, 2012, Narvaez reported doing "better" and feeling "calmer" on her medication. (R. 463.)

---

[2] "Dysthymic" means "characterized by symptoms of mild depression." *Dorland's Illustrated Medical Dictionary* 582 (32nd ed. 2012).

[3] A GAF score refers to a person's overall level of functioning and is assessed using a scale that provides ratings in ten ranges, from zero to one hundred, with higher scores reflecting greater functioning. *See* American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders*, at 27 (4th ed. rev. 2000). The Second Circuit has recognized that "[a] GAF in the range of 51 to 60 indicates '[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers).'" *Zabala v. Astrue*, 595 F.3d 402, 406 n.3 (2d Cir. 2010) (citation omitted).

[4] Ambien is a sedative-hypnotic used to treat insomnia by "slowing activity in the brain to allow sleep." Medline Plus, https://medlineplus.gov/druginfo/meds/a693025.html (last visited Sept. 13, 2019).

[5] Risperidone is an atypical antipsychotic medication that is used to treat the symptoms of schizophrenia as well as episodes of mania (frenzied, abnormally excited, or irritated mood) or mixed episodes of mania and depression. *See* Medline Plus, https://medlineplus.gov/druginfo/meds/a694015.html (last visited Sept. 13, 2019). Risperidone "works by changing the activity of certain natural substances in the brain." *Id.*

[6] Wellbutrin is an antidepressant that "works by increasing certain types of activity in the brain." Medline Plus, https://medlineplus.gov/druginfo/meds/a695033.html (last visited Sept. 13, 2019).

[7] The treatment notes refer to previous treatment that Narvaez received at St. Lukes Roosevelt outpatient psychiatric clinic, where she was prescribed Ambien, Risperidone and Wellbutrin. (R. 464.) However, the

During a follow-up appointment with Dr. Markella on January 19, 2013, Narvaez stated that she had been doing "OK," and that she had been feeling "calmer." (R. 462.) Narvaez also reported "good effect, compliance and tolerance with" her prescribed medications. (*Id*.) However, on March 12, 2013, Narvaez went to the emergency room at St. Luke's Roosevelt Hospital for anxiety. (R. 453-56.) She was discharged the same day after being given Valium. (*Id*.) On March 16, 2013, Narvaez reported to Dr. Markella that she was doing "better" and an examination by Dr. Markella found that her mood was euthymic,[8] and she was cooperative with fair insight and judgment. (R. 461.)

Dr. Markella's psychiatric note from early May 2013 reflects that Narvaez reported being very stressed due to her son's incarceration in April. (R. 459.) She felt hopeless and experienced suicidal ideation. (*Id*.) Narvaez stated that she had self-discontinued her medication in April 2013, because she was worried she was not "fully present" on the medication. (*Id*.) Dr. Markella stressed the importance of compliance, but Narvaez did not want to take Wellbutrin or Risperidone. (*Id*.) On May 16, 2013, a therapist at Metropolitan, Antonio Gonzalez, wrote in a letter that Narvaez was experiencing a lot of stress due to family issues, which impacted "her ability to focus and concentrate." (R. 472.) During a follow up visit later in May 2013, Narvaez reported feeling better since she was last seen and informed Dr. Markella that she had restarted Wellbutrin and Risperidone, with "good compliance, effect and tolerance." (R. 458.) She denied having suicidal ideation. (*Id*.)

Administrative Record does not contain any treatment records prior to December 2012, when Narvaez began treatment at Metropolitan.

[8] "Euthymia" is a state of mental tranquility and well-being; neither depressed nor manic. *Dorland*'s at 655.

On June 19, 2013, Narvaez was seen by Dr. Sejal Shah-Thum, another psychiatrist at Metropolitan. (R. 589.) Dr. Shah-Thum's note lists a diagnosis of dysthymia and states that Narvaez's mood was "fine" and that her affect was in a "fair range." (*Id*.) A note from Dr. Shah-Thum on July 24, 2013 stated that Narvaez "remains anxious at times" and that "she grows quite embarrassed, overwhelmed and irritable, which then contributes to [a] low mood." (R. 588.) However, Narvaez "denie[d] acute, long lasting [symptoms] of depression." (*Id*.) Dr. Shah-Thum started Narvaez on Trazodone[9] in addition to her other medications. (*Id*.)

On September 4, 2013, Dr. Shah-Thum diagnosed Narvaez with anxiety disorder, in addition to dysthymia, and stated that Narvaez "feels anxious, at times numb and reports continued difficulty sleeping." (R. 587.) Dr. Shah-Thum increased Narvaez's Trazodone dosage from 50mg to 100mg. (*Id*.) At an appointment with Dr. Shah-Thum on October 2, 2013, Narvaez reported tolerating her medications well and that her sleep had improved since increasing the Trazodone dosage. (R. 586.) Narvaez's mental status examination showed that she had normal speech, maintained eye contact, had a fair range of affect, was appropriately reactive and had a linear thought process. (*Id*.)

On October 14, 2013, Dr. Shah-Thum partially completed a Psychiatric/Psychological Impairment Questionnaire. (R. 507-14.) Dr. Shah-Thum noted that Narvaez began treatment in November 2012, and that she had been diagnosed with dysthymic disorder and generalized anxiety disorder with a GAF of 55. (R. 507.) Dr. Shah-Thum checked boxes that Narvaez had poor

---

[9] "Trazodone is used to treat depression. Trazodone is in a class of medications called serotonin modulators. It works by increasing the amount of serotonin, a natural substance in the brain that helps maintain mental balance." Medline Plus, https://medlineplus.gov/druginfo/meds/a681038.html (last visited Sept. 13, 2019).

memory, mood disturbance, sleep disturbance, loss of interest, feelings of guilt, hostility and irritability, generalized persistent anxiety, difficulty thinking or concentrating and suicidal ideation or attempts. (R. 508.) In addition, Dr. Shah-Thum indicated that Narvaez experienced sadness, crying spells and insomnia. (R. 509.) Dr. Shah-Thum did not complete a full residual functional capacity ("RFC") assessment, but checked boxes indicating that Narvaez was incapable of low stress work due to her depression and anxiety and that her impairments were likely to produce "good days" and "bad days" such that she would be absent from work more than three times a month. (R. 510-14.)

During a follow-up visit on October 30, 2013, Narvaez reported feeling "stable, okay" and that her sleep, mood and energy were "fine." (R. 585.) On November 27, 2013, Narvaez was feeling well and reported having a good month. (R. 584.) At her next appointment on January 8, 2014, Narvaez reported to Dr. Shan-Thum that she was "feeling well." (R. 583.) Similarly, on March 27, 2014, Narvaez reported that she was "doing well." (R. 582.)

During a visit on May 8, 2014, Dr. Shah-Thum recommended lowering Narvaez's dosage of Wellbutrin based on her complaints that it made her feel restless. (R. 581.) On May 28, 2014, Narvaez reported that, with the reduced dosage of Wellbutrin, she was "feeling less anxious and restless," but was having "tremendous difficulty" with energy and focus. (R. 580.) On July 31, 2014, Narvaez reported that she was "doing fairly well" but that she had good days and bad days. (R. 579.) On September 4, 2014, Narvaez reported feeling "so-so." (R. 578.)

On October 4, 2014, Narvaez was evaluated by Dr. Giannone, another psychiatrist at Metropolitan. (R. 577.) Dr. Giannone noted that Narvaez's mood was five out of ten and that she

had a blunted affect. (*Id.*) He added a prescription for Lexapro.[10] (*Id.*) Dr. Giannone also discussed the possibility of increasing Narvaez's dosage of Risperdal (risperidone), but his note regarding that discussion is cut-off in the record. (*See id.*)

On November 6, 2014, Dr. Giannone completed a Psychiatric Medical Report and Medical Source Statement regarding Narvaez. (R. 526-32.) Dr. Giannone indicated that Narvaez had been receiving weekly psychotherapy sessions and monthly psychiatric consultations since December 2012. (R. 526.) Dr. Giannone noted that Narvaez had a depressed mood, significant irritability and poor judgment. (R. 527.) Dr. Giannone reported that Narvaez had "low frustration tolerance" and was "easily irritable." (R. 528.) Dr. Giannone also reported that Narvaez had difficulties dealing with "work stressors," had a fair ability to understand, remember, and carry out simple job instructions, and had "[p]oor social skills to interact with supervisors and coworkers." (*Id.*) On December 4, 2014, Narvaez reported to Dr. Giannone that she only felt a little better since adding Lexapro. (R. 576.) She also reported that her spirits were better, and she was less depressed and anxious, but she didn't have many good days. (*Id.*) Narvaez described her mood as six to seven out of ten, but "closer to [six]." (*Id.*) Dr. Giannone increased her dosage of Lexapro. (*Id.*)

In January 2015, Narvaez began treatment with Nurse Practitioner, Psychiatric ("NPP") Carol Deutsch. (R. 575.) NPP Deutsch recorded Narvaez's mood and sleep as good, but did not make any notes regarding a mental status evaluation. (*Id.*) NPP Deutsch noted a primary diagnosis of MDD, or major depressive disorder. (*Id.*) Narvaez saw NPP Deutsch approximately

---

[10] Lexapro is used to treat depression and generalized anxiety disorder. *See* Medline Plus, https://medlineplus.gov/druginfo/meds/a603005.html (last visited Sept. 13, 2019). Lexapro is in a class of antidepressants called selective serotonin reuptake inhibitors (SSRIs) and "works by increasing the amount of serotonin[.]" *Id.*

once every twelve weeks for the next year. (R. 571-75.)

On March 26, 2015, Dr. David Cohen, another psychiatrist at Metropolitan, completed a Psychiatric Report for Narvaez. (R. 541-46.) Dr. Cohen diagnosed a mood disorder with a GAF of 60. (R. 541.) He wrote that Narvaez presented with a "history of depression and excessive anxiety . . . [with] mood swings, and irritability . . . low frustration tolerance, and difficulties to respond appropriately to changes." (*Id*.) Dr. Cohen also reported that Narvaez displayed poor judgment and presented as hostile and with a critical attitude. (R. 542.) Dr. Cohen indicated that Narvaez had "moderate" ability to relate to the general public; "moderate" restriction of daily activities; and "mild" deterioration of her personal habits. (R. 544.) He also indicated that Narvaez had a "mild" limitation in performing repetitive tasks; and "moderate" limitations in comprehending and following simple instructions, performing simple and varied tasks, performing tasks requiring minimal or frequent contact with others, maintaining attention and concentration and setting realistic goals. (R. 544-45.) Further, Dr. Cohen indicated that Narvaez had a "marked" impairment in comprehending and following detailed instructions; performing complex tasks; responding appropriately to supervision and criticism; tolerating work related stress; and meeting production, quality and attendance standards. (R. 544-45.) Dr. Cohen stated that Narvaez avoided subways due to crowds, and that her mental health symptoms increased issues of chronic pain in her right hand. (R. 546.)

During an appointment on April 24, 2015, NPP Deutsch noted that Narvaez was sick with the flu, but her mood was "not depressed." (R. 574.) On July 17, 2015, NPP Deutsch's note reflected that Narvaez's mood was euthymic. (R. 573.) On October 19, 2015, NPP Deutsch's note reflected that Narvaez had an occasional "low mood" and occasional self-isolation. (R. 572.)

On October 26, 2015, Dr. Cohen completed another Psychiatric Report focusing on Narvaez's abilities in the year 2013. (R. 553-58.) Dr. Cohen gave a diagnosis of generalized anxiety disorder and dysthymic disorder. (R. 553.) For 2013, Dr. Cohen reported that Narvaez had a "moderate" ability to relate to others, a "moderate" restriction of daily activities and a "mild" deterioration of personal habits. (R. 555.) Dr. Cohen checked boxes that Narvaez was either "seriously limited" or "unable to meet competitive standards" in all areas of mental abilities for unskilled work, except for being aware of normal hazards, which he rated as "limited but satisfactory." (R. 556.) Dr. Cohen also checked boxes that in 2013 Narvaez had a "seriously limited" ability or was "unable to meet competitive standards" in the mental abilities of skilled work due to "excessive irritability, mood disturbance, poor memory and difficulty thinking or concentrating." (R. 557.) In addition, Dr. Cohen checked boxes that in 2013 Narvaez had a "limited but satisfactory" ability to maintain socially appropriate behavior, adhere to basic standards of neatness and use public transit, and was "seriously limited" in interacting appropriately with the general public and traveling to unfamiliar places. (*Id*.) Dr. Cohen anticipated that Narvaez would have been absent more than four days per month in 2013. (R. 558.)

In January 2016, Narvaez began to see NPP Deutsch. (R. 571.) In February 2016, NPP Deutsch noted that Narvaez experienced nightmares and broken sleep, but otherwise her notes indicate that Narvaez presented with a good mood and was sleeping well. (R. 598.) A May 2016 Treatment Plan Review noted symptoms of depression and indicated a diagnosis of Major Depressive Disorder. (R. 592-96.) NPP Deutsch's note from June 2016 indicates that Narvaez was stable and should continue her medications. (R. 591.)

Dr. Cohen prepared another Psychiatric Report, dated September 26, 2016, regarding Narvaez's abilities in the year 2016. (R. 609-14.) Dr. Cohen diagnosed generalized anxiety disorder and major depressive disorder with a GAF of 55. (R. 609.) Narvaez's symptoms included depressed mood, excessive anxiety, panic in crowded places, irritability, anger and insomnia. (R. 610.) Dr. Cohen opined that Narvaez had a "moderate" limitation in the ability to relate to others and interact with the public, a "moderate" restriction in daily activities and a "mild" deterioration of personal habits. (R. 611.) He checked boxes that Narvaez had either "no useful ability to function" or was "unable to meet competitive standards" in nearly all mental abilities needed for unskilled work, except for being "seriously limited" (meaning she would have a noticeable difficulty from 11-20% of the workday) in asking simple questions or requesting assistance and being aware of normal hazards. (R. 612.) Dr. Cohen wrote that this was due to "low frustration tolerance" and "fair/poor abilities" to understand, remember and carry out simple job instructions. (*Id*.)

Further, Dr. Cohen found that Narvaez was "seriously limited" in setting realistic goals and was otherwise "unable to meet competitive standards" or had "no useful ability to function" in the mental abilities needed for semi-skilled or skilled work. (R. 613.) He also checked the boxes that Narvaez was "seriously limited" in interacting appropriately with the general public, maintaining socially appropriate behavior, adhering to basic standards of neatness and using public transit. (R. 613.) Dr. Cohen also found that Narvaez was "unable to meet competitive standards" in traveling to unfamiliar places. (*Id*.) He expected Narvaez would be absent from work more than four days per month. (R. 614.)

**B.    Dr. John Miller – September 2016 Psychiatric Consultative Examination**

Dr. John Miller, a psychiatric consultative examiner, performed an evaluation of Narvaez in September 2016. (R. 600-07.)  Dr. Miller diagnosed "[m]ajor depressive disorder, recurrent episodes with mixed symptoms and anxious distress." (R. 603.) He opined that Narvaez had "no limitation" in following and understanding simple directions and instructions, performing simple tasks, learning new tasks or making appropriate decisions. (*Id*.) In the medical source statement section of his report, Dr. Miller noted that Narvaez had moderate limitations in maintaining a regular schedule, performing complex tasks independently and dealing appropriately with stress, and that she had markedly limited abilities in maintaining attention and concentration and relating adequately with others. (*Id*.) Dr. Miller also completed a Medical Source Statement of Ability To Do Work-Related Activities (Mental) form. (R. 605-07.) For the question regarding Narvaez's ability to understand, remember and carry out instructions, Dr. Miller checked boxes indicating "moderate" limitations in understanding and remembering complex instructions and "marked" limitations in carrying out complex instructions. (R. 605.) Dr. Miller indicated that Narvaez had no limitations in understanding and remembering simple instructions, but moderate limitations in carrying out simple instructions. (*Id.*) He also found no limitations in her ability to make judgments on simple or complex work-related decisions. (*Id.*) In response to a question regarding the factors supporting his assessment, Dr. Miller wrote that Narvaez had a "concentration problem in evaluation" and "some weakness in memory." (*Id.*)

For the questions regarding Narvaez's ability to interact appropriately with others and respond appropriately to changes in a work setting, Dr. Miller checked boxes indicating "marked" limitations in interacting with the public; "moderate" limitations in interacting appropriately with

co-workers, in carrying out simple instructions and in understanding and remembering complex instructions; and "mild" limitation in interacting appropriately with supervisors and in responding appropriately to usual work situations and changes in a routine work setting. (R. 605-06.) Dr. Miller also noted that Narvaez was withdrawn and asocial and that her ability to maintain a schedule was affected by her impairments. (*Id.*) Finally, Dr. Miller also noted that Narvaez could take buses and trains only when they were empty. (*Id.*)

## IV.  ALJ Hearing Testimony

During the first hearing on December 11, 2014, Narvaez testified that she was born in New York City, but lived in Puerto Rico for 15 years and returned to New York City when she was about 17 years old. (R. 44-45.) As for prior work experience, Narvaez testified that she worked for a period of time as a babysitter, caring for three children in her apartment, but stopped doing so because her medication made her drowsy or dizzy, and she did not "want to take care of children." (R. 45-46.) She also testified that she was unable to work because she could not retain information and could not concentrate. (R. 54.) In terms of her activities, Narvaez testified that she went to Rhode Island to visit family about once per year and sometimes cooked. (R. 47.)

The second hearing was held on October 18, 2016. (R. 57.) At that time, Narvaez was living with her son, who was in his early 20s. (R. 60, 63.) Her adult daughter traveled with her to the hearing using the subway. (R. 64.) Narvaez testified that she had depression, anxiety and panic attacks, and that she was afraid of cars and people. (R. 63.) She indicated that she had difficulty concentrating and remembering things and that her medication made her drowsy. (R. 62-63.)

In terms of daily activities, Narvaez testified that she spent her time at home and that sometimes she watched television, went grocery shopping or did cooking and cleaning. (R. 64-

65.) Her son also would help with cleaning, such as mopping, and he would go shopping with her. (R. 64-65, 67.) Narvaez testified that she was afraid to go out unless someone went with her and that her son went with her to appointments. (R. 66-67.) Her son also reminded her to take medication. (R. 68.) She testified that she worked at a senior center in a work fair assignment for less than a month in 2013, and had problems getting along with others. (R. 69-70.) She stated that, if she took her medication, she was drowsy, but if she did not take it, she was aggressive. (*See* R. 69-71.)

Narvaez's daughter, Maria Garcia, also testified at the hearing. (R. 72-76.) Garcia testified that she stopped living with her mother a few years earlier due to her mother's behavior, but had lived with her mother again during her own recent pregnancy up until approximately four or five months prior to the hearing. (R. 73, 75.) Garcia testified that, when she first left, Narvaez was not taking her medication and would try to hit her. (R. 73.) Garcia also noticed that Narvaez would forget that the stove was on and burn food and mostly stayed in her bedroom during the day. (R. 74, 76.) Garcia testified that her mother would not board a crowded subway car. (R. 74.)

Finally, vocational expert ("VE") Raymond Cestar testified at the hearing. (R. 76-95.) The ALJ asked the VE to assume a hypothetical person with Narvaez's vocational profile (including not being fluent in English), along with the physical capacity for work at all exertional levels, but who was limited to jobs involving simple, routine, repetitive tasks and having only occasional contact with supervisors and co-workers and minimal contact (two-to-four times per day) with the public. (R. 79-80, 83.) The VE testified that such an individual could perform work as a kitchen helper (U.S. Department of Labor's Dictionary of Occupational Titles ("DOT") Code 318.687-010; approximately 275,000 jobs nationally), hand packager (DOT Code 920.587-018; approximately

41,000 jobs nationally) or cleaner (DOT Code 323.687-014; approximately 138,000 jobs nationally). (R. 80-82.) The VE testified that each of these jobs required minimal, if any, contact with the public. (R. 83.) However, the VE testified that anyone off task more than ten percent of the time in these jobs would not meet quality standards on productivity and that anything more than one absence per month would be considered excessive. (R. 82.)

## V.     ALJ Friedman's Decision And Appeals Council Review

Narvaez's date last insured was December 31, 2009. (R. 28.) Applying the Commissioner's five-step sequential evaluation, *see infra* Legal Standards Section II, ALJ Friedman found at step one that Narvaez had not engaged in substantial gainful activity after December 20, 2009, her alleged disability onset date. (*Id*.) At step two, ALJ Friedman concluded that Narvaez had the severe impairments of generalized anxiety disorder and mood disorder, not otherwise specified. (*Id.*)

At step three, the ALJ found that Narvaez did not have an impairment or combination of impairments that met or medically equaled one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, in particular, Listing 12.04 (depressive, bipolar and related disorders) or Listing 12.06 (anxiety and obsessive-compulsive disorders). (R. 28-30.) In reaching this conclusion, the ALJ considered the "paragraph B" criteria and determined that Narvaez had a mild restriction in activities of daily living, moderate difficulties in social functioning and moderate difficulties in concentration, persistence and pace. (R. 29.)

After considering the evidence in the record, ALJ Friedman determined that Narvaez retained RFC to perform a range of work at all exertional levels with the non-exertional limitations of work not requiring fluency in English; involving simple, routine, repetitive type

tasks; requiring only occasional contact with supervisors and co-workers; and having contact two-to-four times per day with the public. (R. 30-33.)

In determining Plaintiff's RFC, the ALJ also weighed the medical evidence in the record. First, the ALJ considered Dr. Shah-Thum's opinion, as set forth in a October 2013 Psychiatric Impairment Questionnaire. (R. 32 (citing R. 507-14).) The ALJ noted that Dr. Shah-Thum did not complete the specific functional assessment. (*Id.* (citing R. 510-12).) Thus, the only opinions rendered by Dr. Shah-Thum appear to be that Narvaez was incapable of even low stress work and that her impairments were likely to produce "good days" and "bad days" such that she would miss work more than three days a month. (R. 513-14.) The ALJ ascribed "moderate weight" to Dr. Shah-Thum's opinion, except for the portion of Dr. Shah-Thum's opinion that Narvaez would be absent from work more than three times a month as a result of impairments or treatment. (R. 32.) The ALJ found that "no justification" was shown for that statement, "especially in light of the claimant's ability to regularly attend treatment sessions." (*Id.*)

The ALJ ascribed "minimal weight" to the opinion of Dr. Giannone, as set forth in a November 2014 medical source statement. (R. 32.) The ALJ reasoned that the medical source statement showed "a relatively normal mental status examination" and, thus, was inconsistent with the restrictions Dr. Giannone identified, preventing all work. (*Id.*) The ALJ further found that Dr. Giannone's opinion was inconsistent with Narvaez's treatment records, which showed "improvement with medication and therapy" and that Narvaez was generally coping well.[11] (R. 31-32.)

---

[11] The Court notes that the ALJ's references to treatment notes in Exhibit 12F appear to correspond to the treatment records in Exhibit 13F, as Exhibit 12F is another questionnaire completed by Dr. Cohen and does not contain any treatment notes. (*See* R. 553-89.)

The ALJ also ascribed "minimal weight" to the opinions of Dr. Cohen, which he found to be inconsistent with other substantial evidence in the record. (R. 32.) With respect to Dr. Cohen's March 2015 opinion, the ALJ found that Dr. Cohen's conclusions were inconsistent because he assigned a GAF score of 55, "indicating only moderate symptoms, but still concluded that [Plaintiff] could not work." (*Id*.) In addition, the ALJ found that Narvaez's treatment records were inconsistent with Dr. Cohen's opinion. (*Id*.) With respect to Dr. Cohen's opinion from September 2016, the ALJ found that it was similar and gave it minimal weight "for the same reasons." (*Id*.)

At step four, the ALJ found Narvaez could not perform her past relevant work as a babysitter. (R. 33.) At step five, the ALJ considered Narvaez's age, education and job skills, along with his RFC determination and VE testimony, and concluded that Narvaez could make a successful adjustment to work existing in significant numbers in the national economy, including as a kitchen helper, hand packager and cleaner, as identified by the VE. (R. 33-34.) Therefore, the ALJ found Narvaez was not disabled during the relevant period and denied Narvaez's claims for benefits. (R. 34.)

Following the ALJ's decision, Narvaez sought review from the Appeals Council, which denied her request on December 21, 2017. (R. 1-8.)

## LEGAL STANDARDS

### I.     Standard Of Review

A motion for judgment on the pleadings should be granted if it is clear from the pleadings that "the moving party is entitled to judgment as a matter of law." *Burns Int'l Sec. Servs., Inc. v. Int'l Union*, 47 F.3d 14, 16 (2d Cir. 1995). In reviewing a decision of the Commissioner, a court may "enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or

reversing the decision of the Commissioner . . . with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). "The Court first reviews the Commissioner's decision for compliance with the correct legal standards; only then does it determine whether the Commissioner's conclusions were supported by substantial evidence." *Ulloa v. Colvin*, No. 13-CV-04518 (ER), 2015 WL 110079, at *6 (S.D.N.Y. Jan. 7, 2015) (citing *Tejada v. Apfel*, 167 F.3d 770, 773 (2d Cir. 1999)). "Even if the Commissioner's decision is supported by substantial evidence, legal error alone can be enough to overturn the ALJ's decision[.]" *Id*; *accord Johnson v. Bowen*, 817 F.2d 983, 986 (2d Cir. 1987).

Absent legal error, the ALJ's disability determination only may be set aside if it is not supported by substantial evidence. *See Rosa v. Callahan*, 168 F.3d 72, 77 (2d Cir. 1999) (vacating and remanding ALJ's decision). "Substantial evidence is 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Halloran v. Barnhart*, 362 F.3d 28, 31 (2d Cir. 2004) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). "The substantial evidence standard is 'a very deferential standard of review—even more so than the clearly erroneous standard, and the Commissioner's findings of fact must be upheld unless 'a reasonable factfinder *would have to conclude otherwise*.'" *Banyai v. Berryhill*, No. 17- CV-1366, 2019 WL 1782629, at *1 (2d Cir. Apr. 24, 2019) (summary order) (quoting *Brault v. Social Sec. Admin., Comm'r*, 683 F.3d 443, 448 (2d Cir. 2012) (per curiam) (emphasis in original) (internal quotation marks omitted). If the findings of the Commissioner as to any fact are supported by substantial evidence, those findings are conclusive. *Diaz v. Shalala*, 59 F.3d 307, 312 (2d Cir. 1995).

## II.    __Determination Of Disability__

A person is considered disabled for benefits purposes when she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).

> An individual shall be determined to be under a disability only if [the combined effects of] [her] physical or mental impairment or impairments are of such severity that [she] is not only unable to do his previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which [she] lives, or whether a specific job vacancy exists for [her], or whether [she] would be hired if [she] applied for work.

42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

In determining whether an individual is disabled, the Commissioner must consider: "(1) the objective medical facts; (2) diagnoses or medical opinions based on such facts; (3) subjective evidence of pain or disability testified to by the claimant or others; and (4) the claimant's educational background, age, and work experience." *Mongeur v. Heckler*, 722 F.2d 1033, 1037 (2d Cir. 1983) (per curiam).

The Commissioner's regulations set forth a five-step sequence to be used in evaluating disability claims:

> (i) At the first step, we consider your work activity, if any. If you are doing substantial gainful activity, we will find that you are not disabled. . . .

> (ii) At the second step, we consider the medical severity of your impairment(s). If you do not have a severe medically determinable physical or mental impairment that meets the duration

18

requirement . . . [continuous period of 12 months], or a combination of impairments that is severe and meets the duration requirement, we will find that you are not disabled. . . .

(iii) At the third step, we also consider the medical severity of your impairment(s). If you have an impairment(s) that meets or equals one of our listings in appendix 1 ["Listings"] . . . and meets the duration requirement, we will find that you are disabled. . . .

(iv) At the fourth step, we consider our assessment of your residual functional capacity and your past relevant work. If you can still do your past relevant work, we will find that you are not disabled. . . .

(v) At the fifth and last step, we consider our assessment of your residual functional capacity and your age, education, and work experience to see if you can make an adjustment to other work. If you can make an adjustment to other work, we will find that you are not disabled. If you cannot make an adjustment to other work, we will find that you are disabled. . . .

20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).

If it is determined that the claimant is or is not disabled at any step of the evaluation process, the evaluation will not progress to the next step. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).

"When determining whether a claimant is disabled due to a mental impairment, an ALJ must apply a 'special technique' at the second and third steps of the five-step framework.'" *Cherry v. Comm'r of Soc. Sec.*, No. 17-CV-07999 (VEC), 2019 WL 1305961, at *11 (S.D.N.Y. Mar. 22, 2019) (quoting *Kohler v. Astrue*, 546 F.3d 260, 265 (2d Cir. 2008)). First, the ALJ must determine if the claimant has a "medically determinable mental impairment." *Id.* If the claimant is found to have such an impairment, the ALJ must "rate the degree of functional limitation," across "four broad functional areas: (1) activities of daily living; (2) social functioning; (3) concentration, persistence, or pace; and (4) episodes of decompensation." *Id.* (quoting 20 C.F.R. § 404.1520a(b)-(c)).

After the first three steps (assuming that the claimant's impairments do not meet or medically equal any of the Listings), the Commissioner is required to assess the claimant's RFC "based on all the relevant medical and other evidence in [the claimant's] case record." 20 C.F.R. §§ 404.1520(e), 416.920(e). A claimant's RFC is "the most [claimant] can still do despite [the claimant's] limitations." 20 C.F.R. § 405.1545(a)(1).

The claimant bears the burden of proof as to the first four steps. *Melville v. Apfel*, 198 F.3d 45, 51 (2d Cir. 1999). It is only after the claimant proves that she cannot return to work that the burden shifts to the Commissioner to show, at step five, that other work exists in the national and local economies that the claimant can perform, given the claimant's RFC, age, education and past relevant work experience. *Id.* at 51. In conducting a disability analysis, the ALJ has an affirmative duty to "develop the record." *Swiantek v. Comm'r of Soc. Sec.*, 588 F. App'x 82, 84 (2d Cir. 2015) (summary order) (citing *Pratts v. Chater*, 94 F.3d 34, 37 (2d Cir. 1996)).

III.    **The Treating Physician Rule**[12]

An ALJ must follow specific procedures "in determining the appropriate weight to assign a treating physician's opinion." *Estrella v. Berryhill*, 925 F.3d 90, 95 (2d Cir. 2019). First, the ALJ must decide whether a treating physician's opinion is entitled to "controlling weight." *Id.* The ALJ must give controlling weight to the opinion of a claimant's treating physician as to the nature and severity of the impairment as long as it "'is well-supported by medically acceptable clinical and

---

[12] On January 18, 2017, the SSA promulgated a final rule that dramatically changes the nature of the evaluation of medical opinion evidence. *Revisions to Rules Regarding the Evaluation of Medical Opinion Evidence*, 82 Fed. Reg. 5844, 2017 WL 168819 (Jan. 18, 2017) (codified at 20 C.F.R. §§ 404 & 416). These new regulations apply only to claims filed with the SSA on or after March 27, 2017. Accordingly, because Narvaez's claims were filed before that date, to the extent that the regulations regarding medical opinion evidence are cited in this Opinion and Order, the Court is referring to the version of the regulations effective before March 27, 2017.

laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record.'" *Burgess v. Astrue*, 537 F.3d 117, 128 (2d Cir. 2008) (quoting 20 C.F.R. § 404.1527(c)(2)); *see also Halloran*, 362 F.3d at 32 ("The opinion of the treating physician is not afforded controlling weight where . . . the treating physician issued opinions that are not consistent with other substantial evidence in the record, [including] the opinions of other medical experts.").

If the ALJ decides the treating physician's opinion is not entitled to controlling weight, the ALJ "must determine how much weight, if any, to give it." *Estrella*, 925 F.3d at 95. "Even if the treating physician's opinion is contradicted by other substantial evidence, and so is not controlling, it may still be entitled to significant weight 'because the treating source is inherently more familiar with a claimant's medical condition than are other sources.'" *Tankisi v. Comm'r of Soc. Sec.*, 521 F. App'x 29, 33 (2d Cir. 2013) (summary order) (quoting *Schisler v. Bowen,* 851 F.2d 43, 47 (2d Cir. 1988)). In deciding what weight to assign, the ALJ must "explicitly consider" the following, nonexclusive factors (the "*Burgess* factors"): "(1) the frequency, length, nature, and extent of treatment; (2) the amount of medical evidence supporting the opinion; (3) the consistency of the opinion with the remaining medical evidence; and (4) whether the physician is a specialist." *Estrella*, 925 F.3d at 95-96 (citing *Burgess*, 537 F.3d at 129) (additional citations omitted).

At both steps, the ALJ must give "good reasons" for the weight he gives a treating source's medical opinion. *See Halloran*, 362 F.3d at 32 (2d Cir. 2004) (quoting 20 C.F.R. § 404.1527(c)(2)); *see also Zabala*, 595 F.3d at 409 ("The ALJ was required either to give [the treating physician's] opinions controlling weight or to provide good reasons for discounting them."). "[A]n ALJ's failure

to 'explicitly' apply the *Burgess* factors when assigning weight at step two is a procedural error." *Estrella*, 925 F.3d at 96 (citing *Selian v. Astrue*, 708 F.3d 409, 419-20 (2d Cir. 2013)). However, if "a searching review of the record" assures the Court "that the substance of the treating physician rule was not traversed," the Court should affirm. *Id.* (citing *Halloran*, 362 F.3d at 32.).

## DISCUSSION

As set forth below, because the Court finds that the ALJ improperly rejected all three of the medical opinions of Narvaez's treating physicians, this case shall be remanded for further proceedings.

Plaintiff refers to the "three treating psychiatrists of record" at Metropolitan and alleges that "the ALJ had inadequate cause to reject the treating [o]pinions in this case, violating the treating physician rule in place at the time." (Pl. Mem. at 10-12.) The Commissioner responds that the ALJ properly considered the opinions of the treating physicians and "acted well within his discretion in reconciling the conflicting medical opinions and other evidence and assessing an RFC that was consistent with the record as a whole." (Def. Mem. at 20-22.) The Court considers each of the treating psychiatrists—Dr. Shah-Thum, Dr. Giannone and Dr. Cohen—in turn.

## I.     Dr. Shah-Thum

The ALJ gave Dr. Shah-Thum's opinion "moderate" weight, except for his opinion that Narvaez would miss work more than three times per month. (R. 32.) The Court finds that the ALJ failed to give good reasons for discounting the opinion of Dr. Shah-Thum with respect to Narvaez's likely absenteeism.

It is true that a treating physician's opinion regarding work absences is not given controlling weight where it is not consistent with other substantial evidence in the record. *See*

*Smith v. Berryhill*, 740 F. App'x 721, 724-26 (2d Cir. June 29, 2018) (summary order) (ALJ properly rejected treating physicians' opinions regarding plaintiff's absenteeism when aspects of physician's opinion were "critically flawed" and inconsistent with other substantial evidence in the record).

However, here, unlike in *Smith*, the ALJ did not otherwise find Dr. Shah-Thum's opinion "critically flawed." *Id.* at 726. Instead, the ALJ rejected Dr. Shah-Thum's opinion only as to Narvaez's likely absenteeism. The ALJ pointed to the fact that Narvaez regularly attended treatment sessions, but that fact does not undermine Dr. Shah-Thum's opinion that she would be unable to fulfill the attendance requirements of full-time work. *See Chadirjian v. Berryhill*, No. 17-CV-01476 (CBA), 2019 WL 518542, at *8 (E.D.N.Y. Feb. 11, 2019) (ALJ erred in relying on attendance at treatment to undermine treating physician's opinion regarding likely absences); *Fountaine v. Comm'r of Soc. Sec.*, No. 18-CV-06033 (JWF), 2019 WL 1428522, at *4 (W.D.N.Y. Mar. 29, 2019) (ALJ erred in assigning little weight to treating physician opinion regarding work absences, finding "even if plaintiff attended treatment with some frequency, such attendance would not mean that she can mentally cope with a full-time job").

Moreover, the ALJ's otherwise conclusory statement that Dr. Shah-Thum's opinion is not justified by the record does not constitute a "good reason" for rejecting it. *See Rugless v. Comm'r of Soc. Sec.*, 548 F. App'x 698, 700 (2d Cir. 2013) (summary order) (conclusory explanation that treating physician opinion inconsistent with record did not satisfy requirement to provide "good reasons"). Notably, the record does not include any evidence contradicting Dr. Shah-Thum's opinion. *See Lesterhuis v. Colvin*, 805 F.3d 83, 88 (2d Cir. 2015) (remanding when "nothing in the

record contradicts [the treating physician's] conclusion about the number of days each month that [the plaintiff] is likely to be absent from work").

Here, as in other similar cases, the ALJ's failure to provide good reasons for discounting Dr. Shah-Thum's opinion regarding Narvaez's likely rate of absenteeism is "all the more troubling" because of the VE's testimony that absences in excess of one per month would render her unable to engage in competitive work. *See, e.g.*, *Pines v. Comm'r of Soc. Sec.*, No. 13-CV-06850 (AJN) (FM), 2015 WL 872105, at *9-10 (S.D.N.Y. Mar. 2, 2015), *report and recommendation adopted sub nom. Pines v. Colvin*, 2015 WL 1381524 (S.D.N.Y. Mar. 25, 2015) at 9-10 (remanding for ALJ to elicit further information regarding "this narrow, yet potentially dispositive issue"); *see also Rugless*, 548 F. App'x at 700. Thus, the Court cannot find that the error was harmless. *See Greek v. Colvin*, 802 F.3d 370, 376 (2d. Cir. 2015) (because plaintiff "could perform no jobs available in large numbers in the national economy if he had to miss four or more days of work per month, the ALJ's failure to provide adequate reasons for rejecting [that] opinion was not harmless"); *see also Pines*, 2015 WL 872105, at *10 (citing A*rchambault v. Colvin,* No. 13-cv-00292, 2014 WL 4723933, at *10 (D. Vt. Sept. 23, 2014) ("It cannot be said that the ALJ's analysis of these medical opinions was harmless error because the [vocational expert] essentially testified that if these opinions were adopted, [the claimant] would be unable to work.").

## II.     Dr. Gianonne

The ALJ gave Dr. Giannone's opinion minimal weight because he found the imposed restrictions were inconsistent with the mental status examination and the fact that treatment notes showed improvement with medication and therapy. (R. 32.) However, the ALJ's determination that the mental status evaluation was "normal" reflects his own judgment about

the relevant medical evidence, which is an impermissible basis for affording Dr. Giannone's opinion limited weight. *See Rosa*, 168 F.3d at 79; *see also Barrett v. Berryhill*, 286 F. Supp. 3d 402, 428 (E.D.N.Y. 2018) (ALJ impermissibly substituted own opinion for that of treating physician when he determined that treating physician's findings were "essentially normal"). Moreover, while the ALJ points to a variety of treatment notes from 2013 through 2016 to support his decision to afford Dr. Giannone's opinion little weight, the treatment notes from Dr. Giannone himself from October and December 2014 (only one of which is cited by the ALJ) are consistent with his assessment. (*See* R. 576-77 (noting blunted affect and significant irritability).) While it is the ALJ's duty to weigh conflicting evidence, he may not substitute his own judgment for medical opinion. *See, e.g., Lebron v. Colvin*, No. 13-CV-09140, 2015 WL 1223868, at *18 (S.D.N.Y. Mar. 16, 2015) ("To the extent that the ALJ's finding of inconsistency was based on his own opinion that [plaintiff] could not have both responded well to medication *and* have continued to exhibit several symptoms and marked impairments, the ALJ improperly substituted his own judgment for medical opinion.") (citing *Lopez–Delgado v. Comm'r of Soc. Sec.,* No. 13-CV-05727 (JCF), 2014 WL 3687276, at *8 (S.D.N.Y. July 23, 2014) (finding ALJ committed error by "substitut[ing] his own judgment for competent medical opinion" where the ALJ found that the treating physician's psychiatric assessment report diagnosing claimant with "major depressive disorder recurrent" was inconsistent with the treating physician's notes indicating that some symptoms had abated)).

III.     **Dr. Cohen**

With respect to Dr. Cohen, the Commissioner argues that the ALJ properly accorded minimal weight to his opinions because they were inconsistent with Narvaez's GAF score and treatment notes. (Def. Mem. at 22.)

A GAF score, standing alone, is not a good reason to assign little weight to a treating physician's opinion. *See Estrella*, 925 F.3d at 97. (GAF scores did not provide good reasons for assigning little weight to treating physician's opinion); *see also Alonso v. Berryhill*, No. 17-CV-04769 (DF), 2018 WL 4997512, at *23 n.59 (S.D.N.Y. Sept. 27, 2018) (finding reliance on GAF scores to discount treating physician's opinion "at odds with current medical and regulatory recommendations and recent case law") (citing cases). Indeed, the GAF scale was removed from the fifth edition of the Diagnostic and Statistical Manual of Mental Disorders ("DSM-V"), which was published in 2013, because of the GAF's "conceptual lack of clarity" and "questionable psychometrics in routine practice. DSM-V 16 (5th ed. 2013). Even before that, the SSA declined to endorse GAF scores for "use in the Social Security and SSI disability programs" because GAF scores have no "direct correlation to the severity requirements in [the SSA's] mental disorders listings." Revised Medical Criteria for Evaluating Mental Disorders and Traumatic Brain Injury, 65 Fed. Reg. 50746-01, 50764-65, 2000 WL 1173632 (August 21, 2000).

Nonetheless, an ALJ may rely on a GAF score in conjunction with other evidence and is entitled to weigh conflicting evidence in assigning weight to the treating psychiatrist's opinions. *See, e.g.*, *See Pena Lebron v. Comm'r of Soc. Sec.*, No. 18-CV-00125 (BCM), 2019 WL 1429558, at *15 (S.D.N.Y. Mar. 29, 2019) (finding no error where ALJ relied on GAF score, in addition to other record evidence, in according treating physician's opinion little weight); *see also Maldonado v. Colvin*, 2017 WL 775829, at *18 n.17 (S.D.N.Y. Feb. 28, 2017) (no error when GAF score not only factor ALJ considered in declining to give treating physician's opinion controlling weight) (citing cases).

Here, the ALJ did not rely solely on the GAF score, but also relied on evidence from Narvaez's treatment records to support the weight he assigned to Dr. Cohen's opinion. (R. 32.) However, the Court finds that the treatment notes relied on by the ALJ are not sufficient to undermine Dr. Cohen's opinions, particularly his opinion from 2016. To start, the record contains few treatment notes from 2016 with which to compare Dr. Cohen's opinion. The only notes from 2016 are four treatment notes from NPP Deutsch with short assessments of Narvaez's mood and sleep. (R. 571, 591, 597-98.) And despite these mostly positive assessments, Narvaez's diagnosis remained major depressive disorder and her medications remained unchanged. (*See id.*) Notably, the portions of the record cited by the Commissioner are from 2012 through 2014 and thus do not shed light on Narvaez's condition at the time that Dr. Cohen completed his 2016 report. (*See* Def. Mem. at 22 (citing R. 467, 579, 582, 584, 586).)

Because I find that the ALJ erred in weighing the opinions of Narvaez's treating physicians, I do not address Plaintiff's remaining arguments.

## CONCLUSION

For the foregoing reasons, Plaintiff's motion is GRANTED, the Commissioner's motion is DENIED, and this case is remanded for further proceedings pursuant to sentence four of 42 U.S.C. § 405(g).

DATED: September 13, 2019
New York, New York

_____
**STEWART D. AARON**
**United States Magistrate Judge**

27